**UNITED STATES COURT OF APPEALS**
**For the Fifth Circuit**

No. 97-60789

MOBIL EXPLORATION AND PRODUCING U.S., INC.,

Petitioner-Cross Respondent;

VERSUS

NATIONAL LABOR RELATIONS BOARD

Respondent-Cross-Petitioner.

Petition For Review and Cross-Petition For Enforcement
of an Order of the National Labor Relations Board

December 23, 1999

Before EMILIO M. GARZA, BENAVIDES, and DENNIS, Circuit Judges.

DENNIS, Circuit Judge:

Mobil Exploration and Producing U.S., Inc. ("Mobil") seeks review of an order by the National Labor Relations Board (the "Board") finding that it violated § 8(a)(1) of the National Labor Relations Act by discharging its employee, Bob L. Pemberton ("Pemberton") for statements he made to co-employees during a work break (1) advocating that employees elect a new Union president or join a different union; and (2) that he would take legal action if

Mobil fired him for his part in a group employee effort (i) to end a possibly corrupt agreement by the Union to reimburse Mobil for funds it paid the Union president for his loss of regular and double time wages during his absences from work on Union business and (ii) to recover for the Union any improper payments received by the Union president. The Board cross-petitions for enforcement. We enforce the order.

## I. Factual and Procedural Background[1]

[1] The parties, Mobil, Pemberton, and the NLRB General Counsel, prior to filing briefs and submitting this case to the Administrative Law Judge entered a Stipulation of Facts in which they agreed "that the Charge, Complaint and Notice of Hearing, Answer, Order to Show Cause, and the 'Stipulation of Facts' with attached Exhibits constitute the entire record in this case and that no oral testimony is necessary or desired by any of the parties." The Stipulation of Facts and its exhibits 2 and 3 are filed as an Appendix to this opinion.

The parties' Stipulation of Facts, in part, provides:

* * *

10. At all material times, Pemberton had an ongoing dispute with Glenn Thibodeaux over the operation, policies and practices of the Union and this existence and nature of this dispute was known by employees, supervisors and agents of Respondent. A copy of a letter from Pemberton distributed generally to Union representatives dated December 16, 1991 is attached hereto as Exhibit 2. A copy of a letter from Pemberton distributed generally to bargaining unit employees dated January, 3, 1994 is attached hereto as Exhibit 3. Respondent [Mobil], at all material times, was aware of the existence of Exhibits 2 and 3.

* * *

16. Prior to July 19, 1994, Respondent [Mobil] and the Union had a verbal agreement whereby the President of the Union would be compensated for time lost, including overtime, when away from work on Union business or when his presence as Union President is requested by Respondent. This agreement operated such that, if the employees working in the offshore crew to which the Union President was assigned worked overtime during a week,

2

Bob L. Pemberton was employed by petitioner Mobil for nearly twenty years. At the time of Pemberton's discharge on July 29, 1994, he was a field facility operator on an offshore oil platform. For 12 years prior to his termination, Pemberton was a member of

then the Union President would be paid for that overtime even though the Union President was not working with his crew at that time. Further, the Union would later reimburse Respondent for all compensation received by the Union President, including overtime, for those times when the Union President was determined to have been working on Union business.

17. In or around June, 1994, in a verbal agreement between Respondent and the Union, Respondent ceased the practice referred to in paragraph 16. Respondent and the Union agreed to cease this practice, in part, after receiving complaints about the practice from an unspecified number of Respondent's employees, including Pemberton.

Pemberton's letters to Union representatives and bargaining unit employees attached as exhibits to the stipulation show that Pemberton was actively engaged in urging concerted activities for the benefit of the Union and the bargaining unit employees.

"It is well settled that stipulations of fact fairly entered into are controlling and conclusive, and courts are bound to enforce them[.]" *A. Duda & Sons Coop. Ass'n v. United States*, 504 F.2d 970, 975 (5th Cir. 1974)(citing *United States v. Righter*, 400 F.2d 344, 351 (8th Cir. 1968); *Osborne v. United States*, 351 F.2d 111, 120 (8th Cir. 1965)); *accord Quest Medical, Inc. v. Apprill*, 90 F.3d 1080, 1087 (5th Cir. 1996)(citing, *e.g., United States Abatement Corp. v. Mobil Exploration & Prod. U.S., Inc. (In re U.S. Abatement Corp.)*, 79 F.3d 393, 400 (5th Cir. 1996); *Holiday Inns, Inc. v. Alberding*, 683 F.2d 931, 935 (5th Cir. 1982)).

The dissenting opinion overlooks our obligation to enforce the stipulations of fact of the parties as controlling and conclusive and finds its own version of the facts in contravention of the stipulation. Compare the dissenting opinion at pages 3,4, 5 and 7, and footnotes 5 and 6, with the Stipulation of Facts in the Appendix to this opinion. Also, footnote 7 of the dissenting opinion, which is inconsistent with the text of the dissent, clearly misinterprets what "the majority argues."

3

the Associated Petroleum Employees Union (the "Union"), and he served as a representative of the Union from 1989 to 1991. Pemberton had a long-standing disagreement with the president of the Union, Glenn Thibodeaux ("Thibodeaux"), concerning the operation and policies of the Union. In December 1991, Pemberton sent a letter to his fellow Union members criticizing Thibodeaux's actions as Union president in proposing to help Mobil cut costs by eliminating some employees' jobs, and calling for his resignation. On January 3, 1994, Pemberton distributed a letter to bargaining unit employees in which he said he had declined nomination for Union representative, in part, because of his criticism and disapproval of Thibodeaux as president. The existence and nature of Pemberton's long-standing disagreement with Thibodeaux about Union matters was well known to Mobil. Prior to July 19, 1994, Mobil and the Union had an agreement whereby the Union president would be compensated by Mobil for time lost, including overtime, during which the president was away from work on Union business. Under the agreement, the Union was obliged to reimburse Mobil for all such compensation paid to the Union president. After Pemberton and an unspecified number of other employees complained, Mobil and the Union rescinded the agreement and practice in or around June, 1994. Pemberton asked a Mobil supervisor how much money had been paid by the Union to Mobil under the agreement but she was unable to provide the information. Sometime between June 15 and 22, on a date not specifically known, Pemberton informed a Mobil supervisor

4

that he planned to file an unfair labor practice charge based on Mobil's payment of the Union president under the rescinded plan but would refrain from doing so if the president refunded to the Union any payments he received for time not actually spent on Union business.

In or around June 1994, Pemberton received information that Thibodeaux had worked as a high school teacher during part of the time covered by the agreement. Between June 15 and 22, 1994, Pemberton informed his supervisor, Mary Ellen Waszczak ("Waszczak"), that Thibodeaux had taught at a high school during a time at which he had been reimbursed for being away from work on Union business. Waszczak told Pemberton that the matter would be investigated. However, Waszczak warned Pemberton that he "had better not leave himself open for anyone to come back and to find something that he [was] doing wrong."

On June 23, 1994, Pemberton went to the Lake Arthur High School on one of his off days. Pemberton asked the principal for the dates Thibodeaux had taught at the school in order to determine if they corresponded to the dates he was paid for absences from work due to Union business. The principal refused to divulge any information. A high school representative told Thibodeaux that someone had inquired as to the dates he served as a substitute teacher. When Thibodeaux asked Mobil Labor Relations Adviser Dan Whitfield ("Whitfield") about the matter, he was told that Pemberton had complained about Thibodeaux's improper receipt of

5

Union business compensation while substitute teaching, and that Mobil's security department was investigating the complaint.

On July 7, 1994 Mobil Security Advisor John Burton ("Burton") took a written statement from Thibodeaux, who admitted that he had been paid by the company for one day he worked as a substitute teacher in January 1992, and that he had reimbursed Mobil for his salary on that date. On July 8, 1994, Burton telephoned Pemberton as part of his investigation. During their conversation, Pemberton asked Burton who he was investigating, him or Thibodeaux. Burton stated that he was just going to conduct an investigation into the allegations made by Pemberton and did not know where the investigation would go. Burton told Pemberton that, except for the Union representative, Pemberton should not discuss the investigation with anyone and to tell the representative the investigation was confidential. Pemberton indicated that was fine and he would do that.

On July 17, 1994, Pemberton engaged in a conversation with some co-workers during his and their work break in the galley of a Mobil offshore platform. The galley was a kitchen/living area provided to employees for work and lunch breaks. Waszczak was in a nearby office with the door open. Pemberton began talking about Thibodeaux receiving overtime pay and that Mobil was going to fire Pemberton. Mobil and Pemberton stipulated that Waszczak overheard Pemberton make the following verbatim statements:

> The [Company] is trying to fire me, they have

> gotten a security guy, John Burton after me because I was trying to right a wrong; John Burton will dig something up on me; You know what I'll do, I'll sue the shit out of them.

Waszczak got up, walked into the galley, had a brief conversation with one of the other employees, and returned to her office. She then overheard Pemberton tell his coworkers:

> She's the one [Waszczak] who turned me in to John Burton; She knows about it. I wouldn't be surprised if he had this phone [in the galley area] tapped so he can hear what I'm saying out here; Do you know where [Mobil] gets its investigators . . . from the military. John Burton called me at my home on Friday and Saturday night. People say to me, "Bob you are just out to get Thibodeaux." I tell them they are wrong, I'm not out to get him. He is wrong, he is giving things to [Mobil], we don't have a union, we need to get in with the OCAW [another union], we can't do anything because of the [Union]. He's not going to be president much longer.

On July 29, 1994, Mobil told Pemberton that he was being terminated from employment because of: (1) "improper interference with a Mobil security investigation"; and (2) "insubordination." Pemberton filed a grievance with the Union pursuant to a collective bargaining agreement. After a one-day arbitration hearing, the arbitrator found (1) just cause to support Pemberton's discharge because Pemberton's comments to his coworkers on the offshore platform on July 17, 1994 constituted insubordination due to Burton's instruction that he not discuss the investigation; but (2) there was insufficient evidence to support a finding that Pemberton interfered with the company's

7

investigation by visiting the high school on June 23, 1994 and inquiring about the dates of Thibodeaux's teaching. In addition to the finding of insubordination, the arbitrator found the following incidents contributed to the "cumulative weight of the whole of Pemberon's actions" and contributed to a finding "just cause for termination": (1) Pemberton was insubordinate in May 1994 when he walked out of Waszczak's office after being reprimanded for using offensive language, although Waszczak decided to only orally reprimand Pemberton; (2) Pemberton's record showed "repeated misconduct" which contributed to the arbitrator's finding of just cause for termination.

On April 13, 1996, an administrative law judge ("ALJ") found that deferral to the arbitration award was appropriate, and upheld the arbitrator's decision as not "palpably wrong," finding that the "thrust of Pemberton's remarks was a personal complaint about the investigation." The ALJ also concluded that Mobil had a legitimate business interest in keeping internal investigations confidential, and agreed with the arbitrator that Pemberton's breach of his promise of confidentiality combined with his poor prior conduct was sufficient cause for discharge and compatible with the purposes of the Act.

A divided panel of the National Labor Relations Board refused to enforce the ALJ decision or defer to the arbitrator's award. A majority of the Board found that the award was "palpably wrong" and "repugnant to the Act" because Pemberton's termination was

8

precipitated by his exercise of protected concerted activity, i.e, his July 17 work break conversation with co-workers during which he expressed dissatisfaction with Thibodeaux as a Union leader and his opinion that Thibodeaux should not be president of the Union. The Board ordered Pemberton reinstated and compensated for his loss. Mobil petitions to deny, and the Board cross-petitions to uphold, enforcement.

## II.  Standard of Review

The Board's factual findings must be affirmed if supported by substantial evidence on the record considered as a whole. See *Universal Camera Corp. v. NLRB,* 340 U.S. 474, 487-88 (1951); *Central Freight Lines, Inc. v. NLRB,* 666 F.2d 238, 239 (5th Cir. 1982). Questions of law decided by the Board are reviewed *de novo. See NLRB v. Motorola, Inc.,* 991 F.2d 278, 282 (5th Cir. 1993).

NLRB deference to an arbitration award is an integral part of the administration of federal labor law, but Board deference is nonetheless discretionary. *See NLRB v. South Central Bell Telephone Co.,* 688 F.2d 345, 350 (5th Cir. 1982), *cert denied*, 460 U.S. 1081 (1983); *Hawaiian Hauling Service Ltd. v. NLRB*, 545 F.2d 674, 675 (9th Cir. 1976), *cert. denied,* 431 U.S. 965 (1977) (citing *NLRB v. Plasterers' Union*, 404 U.S. 116, 136-37 (1971)); *NLRB v. Ryder/P.I.E. Nationwide, Inc.*, 810 F.2d 502, 506 (1987). The Board has established criteria to guide its decisions and to this extent self-imposed restraints limit its discretion. *See, e.g., Spielberg*

*Mfg. Co.,* 112 N.L.R.B. 1080 (1955); *Olin Corp.*, 268 N.L.R.B. 573 (1984). In reviewing the Board, we must insure that it adheres to its own standards until they are properly changed by the Board. *See Richmond Tank Car Co. v. NLRB*, 721 F.2d 499, 501 (5th Cir. 1983) (citing *Hawaiian Hauling Service Ltd v. NLRB*, 545 F.2d 674 (9th Cir. 1976), *cert. denied,* 431 U.S. 965 (1977)). We will not deny enforcement unless the Board clearly departs from its own standards or its standards themselves are invalid. *Id.*

### III. Analysis

### A. Activity Protected by the National Labor Relations Act

Section 7 of the National Labor Relations Act guarantees employees "the right to self-organization, to form, join, or assist labor organizations," and "to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection." 29 U.S.C. § 157 (1998). The Supreme Court has often affirmed that the task of defining the scope of Section 7 "'is for the Board to perform in the first instance as it considers the wide variety of cases that come before it,'" *NLRB v. City Disposal Sys. Inc.*, 465 U.S. 822, 829 (1984) (citing *Eastex, Inc. v. NLRB*, 437 U.S. 556, 568 (1978)), and, "on an issue that implicates its expertise in labor relations, a reasonable construction by the Board is entitled to considerable deference." *Id.* at 829-30 (citing *NLRB v. Iron Workers*, 434 U.S. 335, 350 (1978)); *see also NLRB v. Hearst Publications, Inc.*, 322 U.S. 111, 130-31 (1944).

10

The question for decision in the present case is thus narrowed to whether the Board's application of Section 7 to Pemberton's statements to his fellow employees is reasonable.

Although the term "concerted activity" is not defined in the Act, "it clearly enough embraces the activities of employees who have joined together in order to achieve common goals." *City Disposal,* 465 U.S. at 831 (citing *Meyers Indus.*, 268 N.L.R.B. No. 73, at 3 (1984)). The precise manner in which particular actions of an individual employee must be linked to the actions of fellow employees in order to permit it to be said that the individual is engaged in concerted activity, however, must be elucidated by the Board and the courts. *Id.* at 829-31.

The phrase, "to engage in concerted activities," does not refer merely to a situation in which two or more employees are working together at the same time and the same place toward a common goal. *Id.* at 831. Section 7 itself defines both joining and assisting labor organizations -- activities in which a single employee can engage -- as concerted activities. *See id.* Indeed, it is now well recognized that an individual employee may be engaged in concerted activity when he acts alone in several other situations: that in which the lone employee intends to induce group activity, and that in which the employee acts as a representative of at least one other employee, *see id.* (citing, e.g., *Aro, Inc. v. NLRB*, 596 F.2d 713, 717 (6th Cir. 1979); *NLRB v. Northern Metal Co.*,

440 F.2d 881, 884 (3rd Cir. 1971)); that in which an employee honestly and reasonably asserts a right grounded in a collective bargaining agreement, *see NLRB v. City Disposal Sys. Inc.*, 465 U.S. 822 (1984); and individual employee action may also constitute concerted activity if it represents either a "continuation" of earlier concerted activities or a "logical outgrowth" of concerted activity. *See Burle Indus., Inc.,* 300 N.L.R.B. 498 (1990), *enforced without op.,* 932 F.2d 958 (3d Cir. 1991); *Jhirmack Enterprises,* 283 N.L.R.B. 609 (1987); *Rogers Envtl. Contracting,* 325 N.L.R.B. No. 8, (1997); *Every Woman's Place, Inc.,* 282 N.L.R.B. 413 (1986), *enforced,* 833 F.2d 1012 (6th Cir. 1987).

Moreover, employees do not lose their protection under Section 7's "mutual aid or protection" clause when they seek to improve terms and conditions of employment or otherwise improve their lot as employees through channels outside the immediate employee-employer relationship. *See Eastex, Inc. v. NLRB*, 437 U.S. 556, 565 (1978). Thus, the "mutual aid or protection" clause protects employees from retaliation by their employers when they seek to improve working conditions through resort to administrative and judicial forums. *Id.* at 565-66.

The fact that an activity is concerted, however, does not mean that an employee can engage in it with impunity. An employee may engage in concerted activity in such an abusive manner that he loses the protection of Section 7. *See City Disposal*, 465 U.S. at

12

837 (citing *Crown Central Petroleum Corp. v. NLRB*, 430 F.2d 724, 729 (5th Cir. 1970); *Yellow Freight Sys., Inc.*, 247 N.L.R.B. 177, 181 (1980); *Eastex, Inc. v. NLRB*, 437 U.S. 556 (1978); *NLRB v. Babcock & Wilcox Co.,* 351 U.S. 105 (1956)). Also, some concerted activity bears a less immediate relationship to employees' interests as employees than other such activity. It can be assumed that at some point the relationship becomes so attenuated that an activity cannot fairly be deemed to come within the "mutual aid or protection" clause. The task of deciding when that boundary has been crossed is for the Board to perform in the first instance as it considers the wide variety of cases that come before it. *See Eastex*, 437 U.S. at 567-68 (citing, *inter alia*, *Republic Aviation Corp. v. NLRB*, 324 U.S. 793, 798 (1944); *Phelps Dodge Corp. v. NLRB*, 313 U.S. 177, 194 (1941)). For example, the Supreme Court has approved the Board's extension of the *Republic Aviation* rule to cover the distribution of literature by dissident employees advocating the displacement of a union, *see Eastex*, 437 U.S. at n.23 (citing *NLRB v. Magnavox Co.*, 415 U.S. 322 (1974)), and recognizing other Board extensions of the rule to encompass non-organizational literature complaining about an incumbent union leadership or bargaining position. *See, e.g., Ford Motor Co.*, 221 N.L.R.B. 663 (1975), *enf'd* 546 F.2d 418 (3rd Cir. 1976)).

If an activity is both concerted and protected under Section 7 of the Act, Section 8(a)(1) of the Act makes it unlawful for an

13

employer "to interfere with, restrain, or coerce employees" in the exercise of their Section 7 rights. 29 U.S.C. § 158(a)(1) (1998); *see Blue Circle Cement Co. v. NLRB,* 41 F.3d 203, 206 (5th Cir. 1994). Accordingly, to prove a violation of Section 8(a)(1), the General Counsel must establish that the employer interfered with, restrained, or coerced an employee in the exercise of a right to engage in an activity that was both concerted and protected under Section 7. *See, e.g., Reef Indus., Inc. v. NLRB,* 952 F.2d 830, 836 (1991); *Crown Central Petroleum Corp. v. NLRB*, 430 F.2d 724, 729 (5th Cir. 1970) (citing *Welch Scientific Co. v. NLRB*, 340 F.2d 199, 203 (2d Cir. 1965)("[I]f the conduct complained of otherwise violated Section 8(a)(1), good faith is no defense. The cases clearly demonstrate that it is the tendency of an employer's conduct to interfere with the rights of his employees protected by Section 8(a)(1), rather than his motives, that is controlling.")).

**B. Did Mobil's Discharge of Pemberton Violate Section 8(a)(1)?**

Mobil does not contest the finding of the arbitrator, adopted by the ALJ, that the evidence was insufficient to show that Pemberton interfered with Mobil's investigation by his June 23, 1994 inquiry into Thibodeaux's substitute teaching. Pemberton's "contributing" misconduct found by the arbitrator to have occurred between February 1993 and May 1994 was not related to Pemberton's opposition to the Union president or his remarks on July 17th, 1994. Mobil does not demonstrate how those extraneous incidents support

14

its argument that Pemberton's July 17th statements were mere personal griping. Therefore, Mobil can claim to have justifiably fired Pemberton and thereby lawfully interfered with his July 17 statements to his coworkers on the offshore platform only if the statements did not constitute concerted or protected activity.

## 1. Pemberton's July 17 Conduct Was "Concerted Activity" Under Section 7

Generally, to qualify as "concerted activity" under the National Labor Relations Act, 29 U.S.C. § 151 et seq., conduct "must appear at the very least that it was engaged in with the object of initiating or inducing or preparing for group action or that it had some relation to group action in the interests of the employees." *NLRB v. Buddies Supermarkets, Inc.*, 481 F.2d 714, 718 (5th Cir. 1983). A conversation may constitute a concerted activity although it involves only a speaker and a listener, but to qualify as such, it must appear at the very least that it was engaged in with the object of initiating or inducting or preparing for group action or that it had some relation to group action in the interest of the employees. *See Mushroom Transp. Co. v. NLRB*, 330 F.2d 683, 685 (3rd Cir. 1964).[2] Moreover, individual activity

---

[2] "This is not to say that preliminary discussions are disqualified as concerted activities merely because they have not resulted in organized action or in positive steps toward presenting demands. We recognize the validity of the argument that, inasmuch as almost any concerted activity for mutual aid and protection has to start with some kind of communication between individuals, it would come very near to nullifying the rights of organization and

15

that is an outgrowth of prior protected concerted activity, such as an "ongoing labor dispute," is also protected. *Blue Circle,* 41 F.3d at 207-209; *Reef Indus., Inc. v. NLRB,* 952 F.2d 830, 838 (1991).

In view of these principles, we cannot say that the Board erred in concluding that "Pemberton's conduct on July 17 constituted protected concerted activity because it was engaged in with the object of initiating or inducing group action with respect to employees' mutual interests--group opposition to the incumbent Union leadership and support of a fellow unit employee facing possible discipline because of his opposition." *Mobil Oil Exploration & Producing, U.S., Inc.*, 325 N.L.R.B. No. 18, at 3, 1997 WL 713342 (N.L.R.B.) (1997) (citing *Whittaker Corp.*, 289 N.L.B.R. 933 (1988); *Mushroom Transp. Co. v. NLRB*, 330 F.2d 683, 685 (3rd Cir. 1964)). The Board correctly relied on the well settled principle that Section 7 encompasses the right of employees to oppose the policies and actions of their incumbent union leadership and to seek to persuade other employees to take steps to align the union with these opposing views. *See id.* (citing *Machinists Local 707 (United Technologies),* 276 N.L.R.B. 985, 991 (1985), *enf'd,* 817 F.2d 235 (2d Cir. 1987); *Laborers Local 652 (Southern Cal. Contractors' Ass'n)*, 319 N.L.R.B. 694, 698-99

---

collective bargaining guaranteed by Section 7 of the Act if such communications are denied protection because of lack of fruition." *Mushroom*, 330 F.2d at 684.

16

(1995)).  The Board has long acknowledged the critical importance of dissident activity within union organizations.  For example, in *Red Cab, Incorporated*, 194 N.L.R.B. 279 (1971), the Board faced a situation in which an employer discharged union members who vehemently opposed the attempts of union leadership to end a strike.  The Board stated:

> "The discharge of a dissident within a union when that termination is motivated by a desire to eliminate protest must inevitably result in an infringement under Section 8(1)(1) and 8(a)(3) of the employee's right to self-organization.  We believe that inherent in that right is the privilege of protest and persuasion of others.  Without this, effective employee representation becomes a nullity."

*Id.* at 290 (quoting *Nu-Car Carriers, Inc.,* 88 N.L.R.B. 75, 76-77 (1950)); *see also NLRB v. Local 139, Int'l Union of Operating Engineers,* 796 F.2d 985, 989 (7th Cir. 1986) ("When employee members of a union undertake to inform fellow members of what they believe to be corruption of union officials, they are engaged in 'concerted activity.'").  In the present case, as the Board noted, it is stipulated that Pemberton has had an ongoing dispute concerning the operation, policies, and practices of the Union under incumbent Union president Thibodeaux's leadership.  In furtherance of that dispute, Pemberton also joined an unspecified number of other employees in protesting a Mobil-Union verbal agreement to compensate  Thibodeaux for lost wages, with Mobil to be reimbursed by the Union, for  his absences from work that he claimed were necessitated by Union business.  In continuance of that concerted

17

action, Pemberton complained to Mobil about Thibodeaux's alleged abuse of this privilege of Union office and asked Mobil to require Thibodeaux to return any improper payments to the Union. Consequently, Pemberton's protest to fellow employees on July 17 that Mobil was attempting to "dig up" a pretext for firing him because he "was trying to right a wrong" may reasonably be viewed as either a continuation of earlier concerted activities or a logical outgrowth of concerted activity. *See Blue Circle Cement Company v. NLRB,* 41 F.3d 203, 207-208 (5th Cir. 1994)

There is substantial evidence in support of the Board's conclusion that Pemberton's July 17 statements to his fellow workers were another attempt to enlist the support of other employees in opposition to the policies and alleged derelictions of the incumbent Union leadership, and not merely a personal complaint. Mobil's argument that the Board unsoundly or erroneously concluded that Pemberton's July 17 statements were concerted activity, not mere personal griping, is not persuasive. Mobil misplaces its reliance on two Fifth Circuit cases to support its position.

First, Mobil relies upon *NLRB v. Datapoint Corporation*, 642 F.2d 123, 128 (5th Cir. 1981). In *Datapoint*, an employee on the factory floor loudly protested an employer's decision to lay off all but three employees for a week-long period while the company department relocated. Several days later after a contentious

18

meeting with the supervisor who announced the layoff, the employee "using profanity, had loudly proclaimed for all to hear that he had told her off in no uncertain terms." *Id.* at 125. The Fifth Circuit held that the employee's statements did not constitute concerted activity. Instead, the court concluded that the comments comprised only personal gripes not related to any sort of group action. *Id.* at 128. The factual context presented by *Datapoint* is easily distinguishable from the case at hand. *Datapoint* involved the profane tirade of a disgruntled loner. Any semblance of the instigation, incitement and sustenance of concerted group action remains conspicuously absent from the employee's personal campaign in *Datapoint*. In the present case, Pemberton intended his July 17th speech to serve as the catalyst for future group action. Pemberton's conduct throughout his tenure at Mobil reflected a consistent dedication to union efficacy and vitality, and virtually all of his actions related to concerted or union activity in one form or another.

Second, Mobil relies upon *Charles H. McCauley Associates, Incorporated*, 657 F.2d 685 (5th Cir. 1981) to advance its argument. In *McCauley,* an architectural firm dismissed an employee for attempting to organize a union among other employees. The Fifth Circuit found that the employee's complaints to management on behalf of other employees, "though without their express support" constituted "a predicate for possible group activity." *Id.* at 688.

19

Neither the result nor the reasoning of *McCauley* lend any support to Mobil's arguments. In fact, *McCauley* serves as an excellent illustration of this court's approach to activity arising in a union or group context. The concerted nature of the actions in *McCauley* are similar to Pemberton's campaign to initiate or induce group action with respect to employees' mutual interests.

**2. Pemberton Did Not Engage In Concerted Conduct In Such An Abusive Or Insubordinant Manner As To Lose Section 7 Protection[3]**

Mobil argues that Pemberton's concerted activity lost its protection under the Act because (1) he disobeyed Burton's instruction not to disclose the company's investigation of his allegations that Thibodeaux collected compensation for Union work while he was actually substitute teaching at a high school; and (2) his language was too intemperate even for a conversation with only his drilling rig co-workers present.

As the Supreme Court has stated, "[a]n employee may engage in concerted activity in such an abusive manner that he loses the protection of § 7." *City Disposal,* 465 U.S. at 837. The NLRA does not "provide protection to one so flagrantly insubordinate to the legitimate assertion of managerial authority." *NLRB v. Great Dane Trailers, Inc.,* 396 F.2d 769, 771 (1968); *see also NLRB v. Finesilver Mfg. Co.,* 400 F.2d 644, 649 (5th Cir. 1968) ("An

---

[3]The Appendix described in footnote 1 is also relevant to this section of the opinion.

20

employee cannot ordinarily be selective in the manner of obeying a supervisor's instructions. If instructions are flagrantly disobeyed, the employee is properly discharged."). Mobil asserts that Pemberton's insubordinate actions fall outside the protection of the Act because he failed to abide by Mobil's legitimate confidentiality requirements.

The evidence contained in the record does not support Mobil's arguments. First, based on Pemberton's statement that Burton was "trying to dig something up on me," it is reasonable to conclude that Pemberton believed that Burton was trying to find a cause or a pretext to fire him.[4] Therefore, his most practical recourse was to protest the employer's action and seek the support of his fellow workers, i.e., "mutual aid and protection," which he did on July 17th. Pemberton's statement may have implied that he thought the company was looking for a possible cause or pretext for firing him because he had displeased the management by "trying to right a wrong." But his remarks hardly could be understood as a disclosure of the fact that the company was investigating Thibodeaux's activities away from work. Despite Pemberton's suspicion, and Burton's vague remark, about the direction the investigation might take, Pemberton had not been informed of any investigation other than the one related to Thibodeaux. Therefore, the only

---

[4] When Burton issued his investigatory report in August 1994, the subject of the report is identified as "Bob L. Pemberton," and the bulk of the report concerns Pemberton's alleged misconduct.

investigation he had been instructed not to discuss was the Thibodeaux investigation.

Moreover, Pemberton's speech did not violate Burton's instruction that Pemberton not discuss the fact that Mobil was investigating Thibodeaux's conduct. The only references to Thibodeaux in Pemberton's statement was his repetition of his own well-known previous complaints that Thibodeaux had not acted in the best interests of the Union membership, that he had received overtime pay while attending to union business, and that he should be replaced, or that the employees should join a different union.

Because of the company's own actions, Mobil's confidentiality interest in its investigation of Thibodeaux's behavior was "exceedingly minimal," as the Board found. In fact, it may have been nonexistent. Burton testified that the purpose of the confidentiality requirement was to prevent Thibodeaux, as the target of the investigation, from attempting "to cover stuff up." Nothing in Pemberton's July 17th remarks could have alerted Thibodeaux or anyone else to the fact that Thibodeaux was under investigation. Morevoer, it is undisputed that Mobil Labor Relations Adviser Dan Whitfield informed Thibodeaux on June 25, 1994 of the investigation of him brought on by Pemberton's allegations. It is also undisputed that Burton questioned Thibodeaux about Pemberton's allegations on July 7, 1994. Thus, Thibodeaux already knew about the allegations and the investigation before July 17[th.] As the Board noted, there is no evidence that

22

Burton had any significant potential witnesses other than Thibodeaux and Pemberton, or that Pemberton's comments on July 17 were directed to, or overheard by, any potential witnesses. Under these circumstances, the Board reasonably concluded that Mobil had failed to demonstrate a substantial confidentiality interest that could justify the intrusion on Pemberton's exercise of Section 7 rights.

Considering the location and auditors of Pemberton's July 17th statements, Mobil's argument that his language was flagrantly intemperate is lacking in seriousness. Flagrant conduct of an employee even though occurring in the course of Section 7 activity, may justify disciplinary action by the employer. Not every impropriety does, however, because the employee's right to engage in concerted activity permits some leeway for impulsive behavior, which must be balanced against the employer's right to maintain order and respect. *See Crown Central Petroleum Corp. v. NLRB,* 430 F.2d 724, 730 (5th Cir. 1970) (citing *Boaz Spinning Co. v. NLRB,* 395 F.2d 512 (5th Cir. 1968)). Initially, the responsibility to draw the line between these conflicting rights rests with the Board, and its determination, unless arbitrary or unreasonable, ought not be disturbed. *See id*. at 730. Pemberton's work break remarks were made to a small number of his drilling rig co-workers, not to any supervisory personnel, and they were not delivered in an insulting, provocative or violent manner. Under these circumstances, the balance struck by the Board is authorized.

23

We conclude that substantial evidence supports the Board's finding that Mobil had little or no significant confidentiality interest in its investigation of Thibodeaux's alleged substitute teaching activities, that Pemberton did not disobey his instruction to keep quiet about the Thibodeaux investigation, that Pemberton's July 17, 1994 speech was protected, concerted activity under Section 7 of the NLRA, and that Mobil violated Section 8(a)(1) of the Act by discharging Pemberton for that activity.

## C. The Board Did Not Depart From Its Standards Of Review

In its Decision and Order dated November 8, 1997, a panel of the National Labor Relations Board refused to defer to the decision of the arbitrator finding that Pemberton's July 17th speech to fellow employees was delivered in such an obviously insubordinate manner as to be stripped of any protections under the NLRA. The Board determined that Pemberton's activities were protected under Section 7, and found the arbitrator's interpretation and application of the law was repugnant to the Act. Mobil argues that the Board, nevertheless, erred in failing to defer to the decision of the arbitrator.

### 1. Standard for Deferral

Where, as here, the question of whether an unfair labor practice occurred has been decided by an arbitrator, the scope of the deference given by the Board to an arbitrator's decision is described in *Spielberg Manufacturing Company,* 112 N.L.R.B. 1080 (1955), and its progeny.

24

Although supplemented and further articulated by subsequent NLRB cases, the three part test of *Spielberg* remains the core of the Board's post-arbitration deferral policy. Under the *Spielberg* doctrine, the Board will defer to the decision of the arbitrator if three conditions are met: (1) the proceedings are fair and regular; (2) the parties agree to be bound; (3) the decision of the arbitrator is not clearly repugnant to the purposes and policies of the Act. *Id.* at 1082. In addition to a consideration of the three *Spielberg* factors, Board deferral is further conditioned on proof of the arbitrator's adequate consideration of the relevant unfair labor practice issue. *See Olin Corp.,* 268 N.L.R.B. 573, 574 (1984). Finally, the party seeking to prevent deferral to the findings of an arbitrator shoulders the burden of establishing that the preceding standards for deferral have not been met. *Id.* at 574.

In the case before us, the parties concede that the first two conditions of the *Spielberg* doctrine have been met. The arbitrator's adequate consideration of the unfair labor practice issue is similarly not in dispute. The remaining question is whether the decision of the arbitrator is clearly repugnant to the purposes and policies of the Act.

### a) Deferral and the Clearly Repugnant Standard

The Board may, in its discretion, decline to defer to an arbitrator's award if the award is clearly repugnant to the

25

purposes of the Act.  An arbitrator's award is clearly repugnant to the Act if it is "palpably wrong", *i.e.*, "not susceptible to an interpretation consistent with the Act." *Olin Corp.,* 268 N.L.R.B. 573, 574 (1984).  The ALJ found that the arbitrator's decision was not inconsistent with the terms of the Act.  The Board reversed.  The Board has considerable discretion in deciding whether it is appropriate to defer to an arbitration award, and courts will overturn the Board's determination only where that determination is an abuse of discretion.  *See NLRB v. South Central Bell Tel. Co.,* 688 F.2d 345, 350 (5th Cir. 1982), *cert. denied,* 460 U.S. 1181 (1983).  In particular, where the Board chooses not to defer to an arbitrator's decision, courts will not deny enforcement of the Board determination "unless the Board clearly departs from its own standards on deferral." *Richmond Tank Car Co. v. NLRB*, 721 F.2d 499, 501 (5th Cir. 1983).

In cases involving allegations of employee disclosure of confidential information of an employer, the Board has adopted a balancing test to aid in determining whether or not arbitration awards upholding termination or suspension of employees are "clearly repugnant" to the Act. *See Craig Hosp.,* 308 N.L.R.B. 158 (1992); *Bell Fed. Savings & Loan Ass'n,* 214 N.L.R.B. 75 (1974); *Altoona Hosp.,* 270 N.L.R.B. 1179 (1984).  The Board balances the employee's interests in disclosing the information with the employer's legitimate interests in its confidentiality.  *See*

*Altoona Hosp.*, 270 N.L.R.B. 1179, 1180 (1984). The Board upholds discipline of an employee for disclosure of information when the employee's interests in disclosure fail to "outweigh the employer's legitimate interests in confidentiality." *Id.* at 1180. The balancing test even applies when an employee discloses information "for reasons arguably protected by the Act." *Id.*

The ALJ, in determining that deferral was appropriate, focused on what he perceived to be Pemberton's breach of confidentiality. In deciding whether Pemberton's conduct was protected concerted activity, the ALJ agreed that "both arguments have some merit." The ALJ concluded, however, that "the protected concerted nature of the remarks is not overwhelming and the arbitrator's attention to the breach of confidentiality issue as a valid motivation for the discharge is reasonable." In reaching this conclusion, the ALJ relied heavily on cases in which the Board balanced weak claims of protected activity against clearly legitimate employer interests in confidentiality, and upheld employee terminations and suspensions for breach of reasonable confidentiality requirements. *See Craig Hosp.,* 308 N.L.R.B. 158 (1992); *Bell Fed. Savings & Loan Ass'n*, 214 N.L.R.B. 75 (1974).

In *Craig,* the employee, who was a member of an in-house grievance committee, breached the committee's confidentiality rules to which she and the other committee members had agreed. *Craig,* 308 N.L.R.B. at 163. While the breach was pursuant to her advocacy

27

on behalf of a grievant -- arguably protected activity -- the Board concluded, in finding the conduct unprotected, that the breach "did much to undermine the entire grievance process by prejudicing or perhaps intimidating potential witnesses."  *Id.* at 165.

Similarly, in *Bell,* the employee, a receptionist-switchboard operator, disclosed to a union representative information concerning the number of times the employer's president had spoken by telephone to the employer's legal counsel.  *See Bell,* 214 N.L.R.B. at 77.  In finding the employee's conduct unprotected activity, the Board noted that "it seems plain" that an employer has a right to rely on employees "not to disclose information about his telephone calls, particularly those from his legal counsel." *Id.* at 78; *see also Altoona Hosp.,* 270 N.L.R.B. 1179, 1179 (1984) (Board deferred to arbitrator's award sustaining discharge of an employee, who disclosed the name of a patient's mother to a private investigator hired by the employee to aid her prosecution of a grievance, because an employer's "legitimate interest in keeping certain information confidential . . . is unquestionably true with regard to a health care employer whose patient records are especially sensitive.").

However, the ALJ's reliance on the aforementioned cases is misplaced.  In the present case, the employer confidentiality interest scale of the Board's balancing test is empty and clearly cannot budge, much less outweigh, the employee's protected interest

28

in concerted activity. First, Pemberton's conduct was not just "arguably protected". Pemberton was undoubtedly engaged in protected concerted activity under Section 7 of the Act as explained earlier in this opinion. Furthermore, Pemberton's interest in engaging in the protected activity in the reasonable manner he used necessarily outweighs the superficial claim of a confidentiality interest by Mobil in its investigation of Thibodeaux, because Mobil itself, not Pemberton, destroyed or made that confidentiality interest legally insignificant.

Although the Board enjoys ample discretion in deciding whether to acquiesce in an arbitrator's award, the Board must not "clearly depart" from its own standards when electing not to defer. *See Richmond Tank Car Co. v. NLRB*, 721 F.2d 499, 501 (5th Cir. 1983). In the matter at hand, the decision of the Board has a sound basis in precedent. The Board consistently has refused to defer to arbitration awards where no valid factual basis exists for an employer's assertion that otherwise protected employee conduct is outweighed by an employer's legitimate interests. A number of prior Board decisions serve to illustrate this principle.

In *110 Greenwich Street Corporation*, two service employees posted signs in car windows exhorting their employer to honor financial commitments to his employees. Both employees were subsequently discharged. The Board refused to defer to arbitrator's award sustaining the terminations since it determined that the display of protest signs constituted protected activity

29

under Section 7 of the Act.  Furthermore, the facts of the dispute failed to sustain any breach of the employer's alleged interests in the normal functioning of his business.  *See 110 Greenwich Street Corp.,* 319 N.L.R.B. 331, 334-35 (1995).

In *Garland Coal & Mining Company,* a union president was disciplined for his refusal to obey a supervisor's order to sign a memorandum.  The Board determined that the union president was "espousing an official and protected union position" at the time and refused to defer to the arbitrator's award sustaining discipline against the union president.  *Garland Coal & Mining Co.* 276 N.L.R.B. 963, 965 (1985); *accord NLRB v. Owners Maintenance Corp.,* 581 F.2d 44, 47-50 (2d Cir. 1978) (Board did not abuse discretion in declining to defer to arbitrator's award sustaining employer's refusal to reinstate employees allegedly because their leafleting was "grossly disloyal" where facts showed that passing out leaflets related directly to a legitimate employee grievance).

In the present case, the Board appropriately refused to defer to the arbitrator's award on the grounds that the award was "repugnant" to the Act.  The arbitrator's award is not susceptible to an interpretation that is consistent with the goals of the Act. The purpose of the NLRA would be thwarted if Pemberton's genuine and weighty interest in engaging in protected concerted activity were not held to prevail over Mobil's merely pro forma claim of confidentiality in an investigation that the company had completely

30

disclosed to the only person whose conduct was allegedly in question.

Mobil argues that the arbitration award is susceptible to an interpretation consistent with the Act, and that it is not "palpably wrong." As discussed above, Mobil failed to enunciate a legitimate confidentiality concern that would have justified its infringement of Pemberton's protected Section 7 rights. The ALJ deferred to the arbitrator only because he concluded that Pemberton's conduct conflicted with what he perceived to be Mobil's confidentiality interests. Because Mobil had no legitimate confidentiality interest that would justify its interference with Pemberton's exercise of his Section 7 rights, the ALJ's deferral was "clearly repugnant" to the Act because it was "not susceptible to an interpretation consistent with the Act." In such cases, when the facts show that the employer's interests have not been breached, the Board consistently has held that it will not defer to an arbitrator's decision that fails to protect employees' rights to engage in concerted activities because of a misinterpretation or misapplication of the principles and policy of the Act. *See 110 Greenwich,* 319 N.L.R.B. at 334-35; *Garland,* 276 N.L.R.B. at 965. Accordingly, the Board's refusal to defer to the arbitrator's ruling did not in the present case constitute an abuse of discretion or an error of law.

## IV. Conclusion

We conclude that we are required to uphold the Board's

31

decision because substantial evidence supports the Board's determination that Pemberton's actions constituted protected concerted activity and that Pemberton's strong, protected interest in engaging in such activity clearly outweighed Mobil's attenuated confidentiality interest. We further hold that the Board did not abuse its discretion or depart from its standards in finding that the arbitrator's decision was repugnant to the purposes and policies of the Act. Therefore, the Board did not abuse its discretion or depart from its standards in refusing to defer to the arbitrator's ruling. Based on the foregoing, Mobil's petition for review is DENIED, and the Board's cross-petition for enforcement of the order is GRANTED.

# APPENDIX

UNITED STATES OF AMERICA

BEFORE THE NATIONAL LABOR RELATIONS BOARD

REGION 15

MOBIL OIL EXPLORATION &
PRODUCING, U.S., INC.

and                                                                    Case No. 15-CA-12801

BOB L. PEMBERTON, AN INDIVIDUAL

## STIPULATION OF FACTS

1.      Bob L. Pemberton, an Individual, herein referred to as Pemberton, was employed by Mobil Oil Exploration & Producing, U.S., Inc., herein referred to as Respondent, from August 16, 1974 until July 20, 1994. At the time of his termination on July 29, 1994, Pemberton was employed as a field facility operator. He was a member of the Associated Petroleum Employees Union, herein called the Union, for about twelve years prior to his termination and served as a representative of the Union from about 1989 to about 1991.

2.      Pemberton filed a charge in case No. 15-CA-12801 on August 15, 1994, alleging that he was terminated on or about July 29, 1994 because he had previously filed a charge against Respondent. Pemberton filed an amended charge in Case No. 15-CA- 12801 on January 27, 1995, alleging that on or about July 29,1994, he was terminated because of his protected concerted activities and because he had previously filed a charge against Respondent. On January 31, 1995, an Order to Show Cause issued directing the parties to show cause why the Regional Director should/should not defer to the decision of the Arbitrator, Bill Detwiler,  in American Arbitration Association Case No. 71-300-00186-94.  On February 9, 1995, Respondent filed its Response of Employer to Order to Show Cause. On February 14, 1995, the Union filed a response to the Order to Show Cause. On March 30, 1995, Pemberton withdrew the allegation that, on or about July 29, 1994, he was terminated because he had previously filed a charge against Respondent. On March 30, 1995, Complaint and Notice of Hearing issued alleging that on or about July 29, 1994, Pemberton was terminated because he engaged in protected concerted activities. On April 11, 1995, the Respondent filed its answer to Complaint. On February 5, 1996, Counsel for General Counsel issued a Motion Requesting Postponement of Hearing. On February 5, 1996, the Acting Regional Director issued an Order Postponing Hearing Indefinitely. A copy of the formal documents for this case are attached hereto as Exhibits I(a) through 1(o), with

Exhibit 1(o) being an index and description of the formal documents included in Exhibit 1.

3. Respondent, a corporation, with an office and places of business in California and Louisiana, has been engaged in drilling for and producing oil. Respondent, during the 12-month period ending February 28, 1995, in conducting its business operations, sold and shipped goods valued in excess of $50,000 directly to points outside the State of California. Respondent is an employer engaged in commerce within the meaning of Sections 2(2), (6) and (7) within the meaning of the National Labor Relations Act, herein called the Act.

4. The Union is a labor organization within the meaning of Section 2(5) of the Act.

5. At all material times, the following individuals held the respective positions and have been supervisors of Respondent within the meaning of Section 2(11) of the Act and have been agents of Respondent within the meaning of Section 2(13) of the Act: Charles Bennett, Production Foreman; Terry Britt, Production Foreman; Kristina Mosca, Operations Supervisor; and Mary Ellen Waszczak, Senior Production Foreman.

6. At all times since about January 1993 to about March 1993, Robert Gray held the position of Respondent's Production Foreman and has been a supervisor of Respondent within the meaning of Section 2(11) of the Act and an agent of Respondent within the meaning of Section 2(13) of the Act.

7. At all times since about July 1993 to about September 1993, Don Longorio, held the position of Measurement & Production Foreman and has been a supervisor of Respondent within the meaning of Section 2(11) of the Act and an agent of Respondent within the meaning of Section 2(13) of the Act.

8. At all material times, the following individuals held the respective positions and have been agents of Respondent within the meaning of Section 2(13) of the Act: John Burton, Security Advisor; Robert Putney, Labor Relations Manager; George Transier, Labor Relations Manager; Dan Whitfield, Labor Relations Advisor; C.L. Bond, Security Manager; and G.A. Cox, Asset Team Leader.

9. At all material times, Glenn Thibodeaux was President of the Union.

10. At all material times, Pemberton had an ongoing dispute with Glenn Thibodeaux over the operation, policies and practices of the Union and this existence and nature of this dispute was known by employees, supervisors and agents of Respondent. A copy of a letter from Pemberton distributed genera ly to Union representatives dated December 16, 1993 is attached hereto as Exhibit 2. A copy of a letter from Pemberton distributed generally to bargaining unit employees dated January 3, 1994 is attached hereto as Exhibit 3. Respondent, at all material times, was aware of the existence and substance of Exhibits 2 and 3.

11. The collective bargaining agreement in effect between the Employer and the Union does not have any provision requiring the Employer utilize progressive discipline in disciplining employees. The Employer does however have a policy of utilizing a progressive disciplinary procedure when disciplining employees. The procedure operates such that an employee will first receive a verbal warning, then a written warning, then a suspension without pay and termination. The Employer reserves the right to skip any of the steps of the procedure depending upon the severity of the employee conduct requiring discipline.

12. On February 8, 1993, Pemberton received a verbal reprimand from Terry Britt for having an argument with coworkers, using vulgar language during this argument and throwing his hard hat during the argument. A copy of the verbal warning memo signed by Terry Britt dated February 8, 1993; a copy of the statement given by employee Robert Gray to Britt; and a copy of the statement given by employee Ruben Roy to Britt are attached hereto as Exhibits 4(a) through 4(c), respectively.

13. On October 20, 1993, Pemberton received a written reprimand from Charles Bennett for engaging in an argument with Carol Swopes, EMSI technician, who was conducting drug tests for employees on the offshore drilling rig where Pemberton was working at that time. A copy of the interoffice correspondence from Charles Bennett to Pemberton dated October 20, 1993; a copy of the signed handwritten statement of Swopes; a typed copy of Swopes' handwritten statement; and a copy of signed statement given by employee Steve Quibodeaux to Britt dated August 19, 1993 are attached hereto as Exhibits 5(a) through (d), respectively.

14. In or around early May 1994, Pemberton received a verbal reprimand from Senior Production Foreman Mary Ellen Waszczak for making inappropriate comments about management officials of Respondent. These comments included statements to the effect that management officials of Respondent were "stupid" and were "assholes." No written, formal record of this counseling was made by Waszczak or any other supervisor or agent of Respondent.

15. On March 10, 1994, Pemberton received a verbal reprimand for making statements to Longorio which Longorio contended were in violation of Respondent's EEO and discrimination policies. A copy of the Memo to File signed by Longorio dated March 10, 1994 and a typed copy of the Memo to File from Longorio dated March 10, 1994 are attached hereto as Exhibits 6(a) and 6(b), respectively.

16. Prior to July 19, 1994, Respondent and the Union had a verbal agreement whereby the President of the Union would be compensated for time lost, including overtime, when away from work on Union business or when his presence as Union President is requested by Respondent. This agreement operated such that, if the employees working in the offshore crew to which the Union President was assigned worked overtime during a week, then the Union President would be paid for that overtime even though the Union President was not working with his crew at that time. Further, the Union would later reimburse Respondent for all compensation received by the Union President, including overtime, for those times when the Union President was determined to have been working on Union business.

17. In or around June, 1994, in a verbal agreement between Respondent and the Union, Respondent ceased the practice referred to in paragraph 16. Respondent and the Union agreed to cease this practice, in part, after receiving complaints about the practice from an unspecified number of Respondent's employees, including Pemberton.

18. In or around June 1994, Pemberton had a discussion with Operations Supervisor Kristina Mosca in Mosca's office at the High Island Complex where Pemberton informed Mosca of his concerns about Glenn Thibodeaux, the Union president, receiving overtime pay under the agreement referred to in paragraph 16. After being informed by Mosca that the agreement between Respondent and the Union had ceased, Pemberton asked Mosca the amount of money paid out by the Union to Respondent pursuant to the agreement referred to in paragraph 16. Mosca was unable to provide Pemberton with a figure during this meeting.

35

19.    In or around June 1994, Pemberton, while working on the High Island Complex, had a conversation with Wendell Lambert, an employee, where Pemberton and Lambert were discussing Thibodeaux's receipt of overtime pay pursuant to the agreement referred to in paragraph 16. During this conversation, Lambert informed Pemberton that approximately one and a half to two years earlier, two females, who were employed by a catering contractor performing work for Respondent on an oil drilling platform at that time, pointed out Glenn Thibodeaux to Lambert and informed Lambert that Thibodeaux had been their teacher in high school.

20.    Between June 15 and 22, 1994, on a date not more specifically known, Pemberton had a conversation with Senior Production Foreman Mary Ellen Waszczak in her office. In this meeting, Pemberton informed Waszczak that he had discovered that the practice of overtime being paid to Thibodeaux when he was on Union business had been put to a stop. Pemberton told Waszczak that he had called Mosca to thank her. Waszczak stated that she had heard about it at the foreman's meeting. Pemberton told Waszczak that he had spoken with the National Labor Relations Board and discussed filing a claim against the Union. Pemberton told Waszczak that he would not file the claim if Respondent would get Thibodeaux to reimburse the Union. Waszczak then stated that she would pass this on to Mosca. A copy of the signed statement of Waszczak as provided to Security Advisor John Burton, dated July 19, 1994, which discusses the above incident, is attached hereto as Exhibit 7.

21.    Between June 15 and 22, 1994, on the same date but after the meeting between Waszczak and Pemberton referred to in paragraph 20, Waszczak had a conversation with Mosca where Waszczak told Mosca that Pemberton was considering filing a claim against the Union with the National Labor Relations Board but that he would not do so if Respondent got Thibodeaux to reimburse the Union for overtime compensation paid to him pursuant to the agreement discussed above in paragraph 16. Mosca told Waszczak to tell Pemberton about Respondent's policy about using Respondent's time and equipment for his personal gain against Thibodeaux. See Exhibit 7.

22.    Between June 15 and 22, 1994, approximately one to two days after the conversations referred to in paragraphs 20 and 21, Pemberton had a conversation with Waszczak in her office. In this conversation, Pemberton informed Waszczak that Thibodeaux was teaching at a high school while he was supposed to be on Union business and that he had information about two girls who had been on Thibodeaux's platform and asked an employee why Respondent had their school teacher working on one of its platforms. Waszczak asked Pemberton how he knew this. Pemberton told Waszczak that the girls pointed at Thibodeaux and said that he had been their teacher. Pemberton asked Waszczak what she would do about that kind of information on the president of the Union. Waszczak stated that she would treat it as if it were information on any other employee of Mobil and report it to the right people and they could look into it. Waszczak then told Pemberton that he should not use Respondent's time and phones for his "personal desires" for Thibodeaux. Waszczak then told Pemberton that it did not take much for people to figure that he didn't care much for Thibodeaux by initiating charges against the Union president. Waszczak stated that, if they go asking for an investigation to look into the things he had brought forward, he had better not leave himself open for anyone to come back and find something that he is doing wrong. Pemberton stated that he understood, that he knew how to cover himself from Respondent and that he had been having to cover himself for years against that. See Exhibit 7.

23.    Between June 15 and 22, 1994, on a date after the conversation referred to in paragraph 22, Pemberton had a conversation with Waszczak in her office. In this conversation, Pemberton asked Waszczak if

she had heard back from Mosca on whether Respondent was going to make Thibodeaux reimburse the Union for overtime compensation he received pursuant to the agreement referred to in paragraph 16 and what Waszczak had done about the information about Thibodeaux teaching while on Respondent's time. Waszczak told Pemberton that Mosca was looking into whether Respondent was going to make Thibodeaux reimburse the Union and she had not heard back from Mosca. Waszczak also told Pemberton that she had done what she told him she was going to do with the information that Thibodeaux was teaching while on Respondent's time. Waszczak stated that she had reported it to Respondent's Labor Relations Department and an individual in the Labor Relations Department stated that they would look into it. See Exhibit 7.

24. On or about June 22, 1994, Labor Relations Advisor Dan Whitfield sent an interoffice correspondence to Security Manager C.L. Bond and Labor Relations Manager Robert Putney in which Whitfield writes that he had been informed that Pemberton had told Waszczak that Thibodeaux was working as a substitute teacher in or around the Lake Arthur, Louisiana area during times he was scheduled to work but was excused to perform "union business." A copy of this letter dated June 22, 1994 signed by Whitfield is attached hereto as Exhibit 8.

25. On or about June 23, 1994, Pemberton, on a day he was not scheduled to work for Respondent, went to the Lake Arthur High School in Lake Arthur, Louisiana. Pemberton went to the school with the intention of collecting information regarding whether Thibodeaux was working as a substitute teacher on days he was scheduled to work for Respondent but was excused to perform Union business. While there, he had a conversation with Evelyn Broussard, the principal of the Lake Arthur High School. Pemberton informed Broussard that he was looking into the possibility that Thibodeaux was working as a substitute teacher on days when he was being paid by the Union to perform Union business. Pemberton indicated that he and Thibodeaux worked for Respondent and that they were in the Union together. The principal informed Pemberton that this information was confidential. Pemberton did not, at any time, tell the principal that he was a supervisor, agent or investigator for Respondent. A copy of a signed handwritten statement given by Broussard to Burton dated July 19, 1994 and a copy of a typed copy of the statement given by Broussard to Burton on July 19, 1994 are attached hereto as Exhibits 9(a) and 9(b), respectively. A copy of a signed handwritten statement given by Pemberton to Burton dated July 19, 1994 and a typed copy of the statement given by Pemberton to Burton on July 19, 1994 are attached hereto as Exhibits 10(a) and 10(b), respectively.

26. On or about June 25, 1994, Thibodeaux had a telephone conversation with Labor Relations Advisor Dan Whitfield. In this conversation, Thibodeaux informed Whitfield that he had spoken with a representative from Jefferson Davis School Board Office (which oversees the operation of Lake Arthur High School) where the representative of the School Board informed Thibodeaux that a man had gone to Lake Arthur High School and asked School Principal Evelyn Broussard if Thibodeaux had been a substitute teacher at the high school. Thibodeaux then told Whitfield that the School Board representative said that the man asked where the school payroll records were kept and whether these were public or private. Whitfield told Thibodeaux that Pemberton had gone to his foreman, Waszczak, and told her that Thibodeaux had taught at Lake Arthur High School while "on Respondent's time." Whitfield then said that the allegation had been turned over to Respondent's security department. A copy of the signed handwritten statement which relates this information given by Thibodeaux to Security Advisor John Burton dated July 7, 1994 and a typed copy of the statement given by Thibodeaux to Burton July 7, 1994 are attached hereto as Exhibits 11(a) and 11(b), respectively. No member of management of Respondent ever asserted or considered Whitfield's response to

Thibodeaux's questions to be in breach of any security department policy or any company policy, nor at any time was Whitfield instructed not to discuss the investigation with any employee.

27.    On July 7, 1994, Security Advisor Burton began a security investigation for Respondent. Burton, on this date, spoke with Thibodeaux and took a statement from him regarding whether Thibodeaux had worked as a substitute teacher for Lake Arthur High School on days when he was scheduled to work for Respondent but was excused to perform Union business. Thibodeaux provided Burton with copies of his pay records from the school and a letter signed by Cleve Beard, the superintendent for the Jefferson Davis Parish school system, of which Lake Arthur High School is a part. The letter from Beard read that Thibodeaux had worked as a substitute teacher on January 30, 1992 and that this was the only day since 1990 (when Thibodeaux became president of the Union) that Thibodeaux had served as a substitute teacher at Lake Arthur High School. Thibodeaux informed Burton that, on January 30, 1992, he was on Union business but that Respondent was reimbursed for Thibodeaux's salary for that day. See Exhibits 11(a) and 11(b). A copy of a letter from Beard to Thibodeaux signed by Beard dated July 5, 1994 are attached hereto as Exhibit 12.

28.    On or about July 8, 1994, Burton had a telephone conversation with Pemberton. Burton introduced himself as being with security for Respondent and stated that he was going to be looking into the allegation concerning Thibodeaux's substitute teaching while being paid by the Union. Pemberton asked Burton if Burton was investigating him (Pemberton). Burton asked, "Do what?" Pemberton asked Burton how he knew about this. Burton stated that a letter came through the Employee Relations department that security conduct this investigation and that he needed to speak with Pemberton about it. Pemberton asked Burton why he needed to talk to him. Burton stated that Pemberton was the one who came forward with the allegation and that he always liked to go back to the source of the information and find out as much as he could when starting to conduct investigations. Pemberton asked Burton again who he was investigating, he or Thibodeaux. Burton stated that he was just going to conduct an investigation into the allegations and he did not know where the investigation would go. Pemberton agreed to speak with Burton and they agreed that Pemberton could have a representative from the Union present for the interview. Burton then told Pemberton that he wanted Pemberton not to discuss the investigation with anybody. Burton told Pemberton that he understood that he had to tell the Union representative but he should not discuss the investigation with anybody. Burton then told Pemberton that this was a company confidential investigation and that he was not to discuss anything that they had talked about on the phone that day. Burton then told Pemberton that he should stress this point with the Union representative. Pemberton indicated that was fine and he would do that.

29.    On or about July 9, 1994, Burton had a telephone conversation with Pemberton by telephone where Burton called Pemberton. In this conversation, Pemberton and Burton changed the date and time of their meeting for Pemberton to give a statement for the investigation. Burton then told Pemberton that he should not discuss the investigation with anybody, that this was a company confidential investigation and that Pemberton should not discuss anything which they had spoken about on the phone.

30.    Respondent does not have any formal written policy which prohibits interference with an official security investigation or which requires compliance with an official security investigation and there are no documents or examples to indicate that a past practice exists. However, it is Respondent's contention that a past practice has been established which requires that an employee cooperate with a security investigation in the manner instructed by the investigator conducting the investigation.

31. On or about July 17, 1994, in a platform meeting on the High Island Complex, attended by Pemberton and Waszczak, Pemberton stated that due to circumstances which arose over the past few weeks, he was concerned about working on a team that was working with represented employees. Waszczak asked Pemberton why. Pemberton stated that he was not permitted to talk about it. Waszczak stated that, if that was the case, then they would not want him to and that he should let them know how he would like them to handle his spot on the team. Pemberton then stated that he did not think it would be a good idea to be working on the team and stated again that he was not allowed say why. See Exhibit 7.

32. On or about July 17,1994, at about 7:10 PM, after the events discussed above in paragraph 31, Waszczak was sitting in the foreman's office on the High Island Complex with the door open. She heard Pemberton come in the area where the office was located speaking very loudly. Pemberton was not on working time. The area where Pemberton entered was the galley, a kitchen/living area on the platform, used by employees working on the platform while those employees were not on working time or were on lunch or on break. Steve Gardner, an employee, was in the area as he was on break. Bruce Rabalais, an employee, was in the area reading a newspaper. Another employee with the last name of Richard, whose first name is not known, was also in the area. Other unspecified employees were also in the galley at the time Pemberton was present. Pemberton then began talking about Glenn Thibodeaux receiving overtime pay and that Respondent was trying to fire him (Pemberton). At about 7:20 PM, Waszczak heard Pemberton make the following statements which she identified in her July 19, 1994 statement to Burton attached hereto as Exhibit 7 as being verbatim: "[Respondent] is trying to fire me, they have gotten a security guy, John Burton after me because I was trying to right a wrong;" "John Burton will dig something up on me;" "You know what I'll do, I'll sue the shit out of them." At this point, Waszczak got up from her desk in the office and walked out into the galley. Waszczak asked Rabalais if he was going to be around for awhile. Rabalais said that he was. Pemberton was silent while Waszczak was in the galley. When Waszczak got back to her office, she heard Pemberton make the following statements: "She's the one who turned me in to John Burton;" "She knows about it;" "I wouldn't be surprised if he had this phone [in the galley] tapped so he can hear what I'm saying out here;" "Do you know where [Respondent] gets its investigators ... from the military;" "John Burton called me at my home on Friday and Saturday night;" "People say to me, 'Bob, you are just out to get Thibodeaux.' I tell them they are wrong, I'm not out to get him. He is wrong, he is giving things to [Respondent], we don't have a Union, we need to get in with the OCAW, we can't do anything because of the [Union]. He's not going to be president much longer." See Exhibit 7.

33. On or about July 19, 1994, Burton met with Pemberton and David Bain, a representative of the Union, on the High Island Complex for the purpose of taking a statement from Pemberton. See Exhibits 10(a) and 10(b).

34. Between July 19, 1994 and July 29, 1994, on an unspecified date, Burton had a conversation with Whitfield where Burton briefed Whitfield on the information he collected during his investigation. While briefing Whitfield, Burton informed Whitfield that he believed that Pemberton had interfered with the investigation.

35. Between July 19, 1994 and July 29, 1994, Waszczak in a conversation with Mosca made a recommendation to Mosca that Pemberton be terminated because of his interference with a security

investigation by going to Lake Arthur High School on or about June 23, 1994, and engaging in the activities described above in paragraph 25; and for insubordination for failing to abide by the confidentiality instructions given by Burton by engaging the activities described above in paragraph 32. This recommendation was affirmed by Mosca.

36.    Between July 19, 1994 and July 29, 1994, Mosca made a recommendation to Whitfield that Pemberton be terminated because he engaged in misconduct by interfering with a security investigation by going to Lake Arthur High School on or about June 23, 1994, and engaged in the conduct described above in paragraph 25; because he engaged in insubordination by failing to abide by the confidentiality instructions given by Burton by engaging the activities described above in paragraph 32; because of Pemberton's prior discipline described above in paragraphs 12 and 13; and for Pemberton's general course of conduct. Whitfield affirmed this recommendation.

37.    On or about July 26, 1994, Pemberton had a phone conversation with Waszczak where Waszczak told Pemberton that he should report to work and that he was suspended without pay until further notice. Waszczak did not specify the reasons for the suspension to Pemberton during this conversation.

38.    On or about July 29, 1994, Pemberton had a phone conversation with Waszczak where Waszczak informed Pemberton that he was being terminated because of interference with a security investigation and insubordination. Waszczak refused to provide more details to Pemberton with regard to the reasons for his termination.

39.    On an unspecified date after July 29, 1994, Pemberton received a letter dated July 29, 1994, titled "Termination of Employment," signed by Waszczak which read that Pemberton's employment with Respondent was terminated effective July 29, 1994. The reasons for the termination were stated as improper interference with a Mobil security investigation and insubordination. A copy of this letter signed by Waszczak dated July 29, 1994 is attached hereto as Exhibit 13.

40.    On an unspecified date after July 29, 1994, Pemberton filed a grievance over his termination with the Union pursuant to the grievance/arbitration procedure in the collective bargaining agreement in effect at that time. This grievance was subsequently processed to arbitration by the Union and Respondent.

41.    On or about August 23, 1994, Burton completed his investigation and issued his investigative report and investigative report synopsis. This investigative report concluded that Thibodeaux did not violate any company rules in substitute teaching at Lake Arthur High School while serving as president of the Union. The report further noted that Pemberton was terminated, effective July 29, 1994, for improper interference with a Mobil security investigation and insubordination. A copy of a letter from Security Manager C.L. Bond to Asset Team Leader G.A. Cox signed by Bond dated August 23, 1994 and a copy of Burton's investigative report synopsis are attached hereto as Exhibit 4(a) and 14(b), respectively.

42.    On or about November 8, 1994, an arbitration hearing was held over the grievance filed by Pemberton over his termination. This arbitration was assigned Case No. 71-300-00186-94 by the American Arbitration Association. A copy of the arbitration transcript is attached hereto as Exhibit 15.

43.    On or about January 10, 1995, the arbitrator in Case No. 71-300-00186-94 issued his decision upholding the termination of Pemberton, the grievant. A copy of the arbitrator's decision signed by Bill

Detwiler, arbitrator, dated January 10, 1995 is attached hereto as Exhibit 16.

44.     It is Respondent's contention that Pemberton's discharge was based on his actions in interfering with the security investigation, insubordination in failing to follow Burton's orders not to talk about the security investigation and based on his history of past misconduct. Further, it is Respondent's contention that the National Labor Relations Board should defer to the arbitrator's decision under the standards as set out in Spielberg Wk. Co.

45.     It is the contention of the General Counsel that when Pemberton engaged in the activities described above in paragraphs 25 and 32, he was engaged in protected concerted activities and therefore these activities cannot form the basis for a lawful discharge. Further, it is the contention of the General Counsel that, absent Pemberton's protected concerted activities, Respondent would not have had cause to terminate Pemberton. Further, it is the contention of the General Counsel that deferral to the arbitrator's award is inappropriate as this award is repugnant to the National Labor Relations Act.

The parties agree that the Charge, Complaint and Notice of Hearing, Answer, Order to Show Cause, and the "Stipulation of Facts" with attached Exhibits constitute the entire record in this case and that no oral testimony is necessary or desired by any of the parties.

By entering into this stipulated agreement, the parties do not necessarily concede the relevance of each fact recited, and any party urging irrelevance would do so in a brief. This stipulation is made without prejudice to any objection that any party may have as to the relevance, materiality or competency of any facts stated herein.

The parties request that the Administrative Law Judge set a time for the filing of briefs.


/s/_____
Bob L. Pemberton, An Individual


/s/_____
Phil Jones, Esq.
for Mobil Oil Exploration and Producing, U.S., Inc.


/s/_____
William T. Hearne, Esq.
Counsel for General Counsel for National Labor
Relations Board Region 15

The parties agree that the Charge, Complaint and Notice of Heating, Answer, Order to Show Cause, and the "Stipulation of Facts" with attached Exhibits constitute the entire record in this case and that no oral testimony is necessary or desired by any of the parties.

By entering into this stipulated agreement, the parties do not necessarily concede the relevance of each fact recited, and any party urging irrelevance would do so in a brief. This stipulation is made without prejudice to any objection that any party may have as to the relevance, materiality or competency of any facts stated herein.

The parties request that the Administrative Law Judge set a time for the filing of briefs.

/s/_____
  Bob L. Pemberton, An Individual


/s/_____
  Phil Jones, Esq.
  for Mobil Oil Exploration and Producing, U.S., Inc.


/s/_____
  William T. Hearne, Esq.
  Counsel for General Counsel for National Labor Relations Board Region 15

# Bob L. Pemberton

10837 Timbergrove Lane • Corpus Christi, Texas 78410 • (512) 242-9473

December 16, 1991

Dear A.P.E.U. Representative,

This letter is to inform you of a incident that I know you
will find to be of interest to all hourly employees
represented by the A.P.E.U.

First, let me explain to you who I am, why I am writing
this to you, and what I am asking of you.

My name is Bob Pemberton, I went to work for Mobil on
August 16, 1974. Currently I work offshore as an F.F.O.
out of Rockport, Texas. I have been represented by the
A.P.E.U. for 10 of the 17 years I have been with Mobil and
I totally support the Charter and By-Laws of the A.P.E.U.
and I strongly believe it is every union member's job to
do what is necessary to maintain or even better to
strengthen the Union. Having worked as a technician and
also as a foreman, I have had the opportunity to
experience both sides of the "fence" and I must tell you I
most definitely prefer working as hourly over salary.

I believe Mobil is an excellent company to work for, but
in my 17 years of experience I have learned that $8.00 a
month dues paid to the Union is cheap insurance from
losing my job to contractors, taking cuts in pay, or
vacation, and other contractual benefits. The contract
also provides for fair and equal treatment based on
seniority and eliminates the "Kiss Ass Syndrome". In these
hard times Mobil management is even more likely to try to
cut valuable benefits and without the Contract, we as
Union members would certainly feel the effects of this
more than we already do. To bad our insurance plan is not
under the Contract.

In the past I have been a representative, but currently I
am not or I would be here for this meeting. Since I can
not be here I felt I must, in some way communicate to you
this important message before you meet with Glenn
Thibodeau, A.P.E.U. President this week. Glenn is aware of
the actions I plan to take as I spoke with him on 12-6-91
and on 12-13-91.

I ask you to read this letter, ask yourself if you think
the actions that Glenn has taken are appropriate for our
Union President. Ask questions of the Union President
about the accusations being made against him and let him
know how you feel.

EXHIBIT 2

55

During the first week of October 1991 I attended a Team Building Session in Baton Rouge, La. Attending this meeting was 40 or 50 people including Glenn. We divided up into teams and Glenn joined a team to look at cutting among other things, expenses for the West Cameron 71 field. Glenn was chosen as the champion, leader, for his team. I was on a safety team and was not listening to what transpired on Glenn's team until he made his presentation to the whole meeting, including Management.

His presentation offered many cost cutting plans, the worst among all of them, especially for our Union President to be championing was to cut 12 jobs in the 71 field; 4 of which were hourly. Now, after he made his presentation he came over to me, knowing by the look on my face that I could not believe he had done this, he ask me something to the effect of, are you ready to jump on me? Among some of the things I said right off, "Your job as Union President is to preserve as many jobs and benefits as possible and let Management make the cuts. You shouldn't even think about cutting jobs."

Glenn's next comment was, "Well Bob we have got to cut expenses where we can or all of us are going to be out of a job." and he added something to effect, I was not saying cut these jobs, I was saying just move these hourly people into vacancies in the High Island Area.

I say, our union president should think of what is in the best interest of the Union first, then secondly think of what is best for the Company. Any Union member who does otherwise has got his priorities seriously wrong. The Company is always going to do what is best for the Company, which may or may not also-be in the best interest of the Union. No one is going to watch out for best interest of the Union except the Union officers and every union member.

In my conversation with Glenn on 12-6-91, he stated to me that he had not told me the full story, of which he said was that Mr. Brooks, Operations Supervisor, intended to make a cut of 24 jobs, 8 hourly, and he was just compromising with management on the intended cuts.

I do not understand why Glenn did not being this up for defense when he and I confronted each other at the session, BUT HE DID NOT BRING IT UP. He just said, we have got to cut expenses where we can or we will all be out of a job. I ask, why is he bringing it up now? Purely for self defense? I say it is that he sees he made a serious mistake by promoting the cut backs. Regardless, I have to wonder why he could not have recommended no cuts in hourly personnel. My feeling is he should have dismissed himself from the Team if the rest of the Team insisted on cutting hourly people. As I understand, even the first line supervisors in the 71 D field were not happy, to say the least, about this suggestion to cut hourly jobs in their area.

My response to Glenn's actions is that we can not
eliminate hourly jobs anywhere with out losing a job
somewhere at the end of the backtracking chain. With all
the properties that are for sale right now, someone is
going to lose a slot to move into every time any hourly
job is cut, and I hate to think we have a Union President
who encourages or even thinks about making such a cut. I
just wonder what other suggestions he might feel compelled
to make to help the Company through these hard times.

Among other things that our Union President has done which
are questionable is the fact that Glenn made an agreement
with the Company in Electra, Texas to allow contractors to
be allowed to come in and replace Union represented
employees before the sale of the property was completed.
He went outside the contract in doing this. Fortunately
for those involved, the sale of the property was completed
shortly thereafter and the employees came out ahead. On
the other hand, if the property had not sold then the
employees could had been forced to move years before it
would have been necessary. Regardless, I don't want any
President allowing contractors to come in and take my job
even for one day.

I don't know if you will agree with me but the following
incident was something that just did not look good from my
view point and is in no way a violation of the Contract or
By Laws. In 1989 Mobil won an award from the government
for our safety record and Management asked Glenn to go to
Washington D.C. to receive this award on behalf of the
hourly employees. I feel anyone but the Union President
should have been the one to go on an all expense paid (by
the Company) trip to Washington D.C.

I believe in these hard times, we need a Union President
as hard as nails in dealing with the Company. We are all
going to be affected by property sales and backtracking is
going to be more common place. Our future working for
Mobil E. & P. is not bright and job stability is becoming
a thing of the past, especially for the low in seniority,
but the low in seniority should be the most concerned
about having a strong Union.

What can you do now?

First, going through the procedures of the By-Laws under
ARTICLE VII (g) it says in part, "The Executive Committee
shall have the responsibility of suspending or expelling
any officer..., who is found guilty of violating the
membership pledge."

Have your Committeeman do this as the By-Laws call for.

Or secondly, going through the procedures of the By-Laws
under ARTICLE II (f) on page 15, 25% of the members in
Glenn's local unit, must request a recall. Then at least
2/3's of the members then present for the vote are
required to have him recalled.

97-60789.CV0

If possible we might be able to have a simple resignation from Glenn, then we can go from there. I truly hope Glenn will resign for the best interest of the Union. We do not need a lot of turmoil to disrupt the Union right now, and we all need to stand together.

Please feel free to call me if you have any questions or comments. Call me at home at 1-512-242-9473 or at the platform I operate, Big Mat 8-342-7448.

Sincerely,

Bob Pemberton

97-60789.CV0

58

# Hig island Area Local
## A.P.E.U.
ASSOCIATED PETROLEUM EMPLOYEES' UNION
"B" Crew
Notice of Election
Date: 01-03-94

This last Thursday, we had our nomination meeting for our representative election which is to be held on *February 10, 1994*. There were only eight members in attendance which also were the personnel scheduled for the first flight offshore that morning.

There were two nominations made at the meeting. David Bain and Mitchell Kyle, both of which have been representatives before in other areas. Either of these men I know would be good representatives and I am glad to see both nominated. David has accepted his nomination and Mitchell will let me know by next hitch as to whether he will accept his nomination. This job carries a good bit of extra responsibility with it and can take a lot of a person's time which may not be compensated except by the satisfaction and thanks received when a union member needs help.

I would like to add that I appreciate the union members who expressed their interest in having me run in this election. Regrettably I have declined nomination this time due to a couple reasons. One is simply my disapproval and criticism of our union president. The other is the letter of reprimand Charles Bennett is responsible for putting in my file. He has obviously got a grudge against me for some reason, but that's fine with me. I am sure most of you know me well enough to know how I feel about that. Until this is finally resolved through arbitration I feel it is best for me to wait until the next election to run.

I hope to have some ballots by next hitch and those who are eligible to vote and will not be able to attend the meeting may get them from me then. We have plenty of time before the election right now. As I stated before, I know some union members may not want to attend on *February 10, 1994 at 6:00 A.M.* due to being on the second or third flights, but everyone is encouraged to attend. Please note again you do not have to be present to vote for your choice of representatives from those on the ballot, but you will have to mail your marked ballot in a sealed envelope with a return address to me before the *February 10th* election meeting.

One last note for those who have not signed a check-off for *A.P.E.U.* dues deductions. If you want to participate in this election, you must get your check-off authorization in as soon as possible. Show your support of the *ASSOCIATED PETROLEUM EMPLOYEES' UNION.*

Best Regards,

Bob Pemberton
F.F.O. HI 595 D (ext 4571)

59

EMILIO M. GARZA, Circuit Judge, dissenting:

The majority agrees with the National Labor Relations Board ("the Board") that the arbitral award in this case was "not susceptible to an interpretation consistent with the [National Labor Relations] Act." I disagree.

In the case *sub judice*, the Board reversed the findings of both the arbitrator and the administrative law judge ("ALJ"). Under its own standards, the Board should have deferred if:

(1) the proceedings appear to have been fair and regular
(2) the parties agreed to be bound
(3) the decision is not "*clearly repugnant* to the purposes and policies of the Act"

*Spielberg Manufacturing Co.*, 112 N.L.R.B. 1080, 1082 (1955) (emphasis added); *see also Richmond Tank Car Co. v. NLRB*, 721 F.2d 499, 502 (5th Cir. 1984) (applying *Spielberg*). "Clear repugnance" may be found only if the arbitral award was "not susceptible to an interpretation consistent with the Act." *Olin Corp.*, 268 N.L.R.B. 573, 574 (1984); *see also Richmond Tank Car*, 721 F.2d at 501 (applying *Olin* deference). Here, the Board held that the award was "not susceptible to an interpretation consistent with the Act" because Pemberton was fired solely for activities that were both "concerted" and "protected." *Mobil Oil Exploration and Producing, U.S., Inc.*, 325 NLRB No. 18, 1997 WL 713342, at *1, *3 (Nov. 8, 1997); *see generally NLRB v. Washington Aluminum Co.*, 370 U.S. 9, 16, 82 S. Ct. 1099, 1104, 8 L. Ed. 2d 298 (1962) (holding that § 7 prohibits dismissal only for those activities that are both

97-60789.CV0                                    49

"concerted" and "protected").[5]

"It is the duty of the courts to insure Board adherence to the *Spielberg* doctrine," *NLRB v. South Cent. Bell Tele. Co.*, 688 F.2d 345, 350 (5th Cir. 1982), keeping in mind "the policy favoring the settling of labor disputes by arbitration." *Richmond Tank Car*, 721 F.2d at 501 (citation omitted). We review the Board's failure to defer for abuse of discretion, *see South Cent. Bell Tele. Co.*, 688 F.2d at 350; *NLRB v. Magna Corp.*, 734 F.2d 1057, 1063 (5th Cir. 1984), and its findings that Pemberton's conduct was "concerted" and "protected" for substantial evidence.[6]

---

[5] The three-member NLRB panel that decided this case split 2-1. Member Higgins, dissenting, argued for deferral in light of the fact that reasonable people could disagree about whether Pemberton's conduct was "concerted" and "protected." *See Mobil*, 1997 WL 713342 at *9 (Higgins, Member, dissenting) ("Under *Spielberg-Olin* deferral principles, the fact that the Board could reasonably come to a different conclusion is not a basis for refusing to defer."). In his concurrence, Chairman Gould agreed with Member Fox that the arbitral award was "clearly repugnant," but also argued for lessening the *Olin* deferral standard to require arbitral awards to comply with Board precedent. *See id.* at *7 (Gould, Chairman, concurring) ("For an arbitral award not to be clearly repugnant to the purposes and policies of the Act under *Spielberg*, I would require that it be consistent with Board precedent."). Despite the Chairman's reservations, we must examine this case as if *Olin* was unquestioned, as the Board must follow its standards until they are properly changed. *See Drug Plastics & Glass Co., Inc. v. NLRB*, 44 F.3d 1017, 1022 (D.C. Cir. 1995) ("In order to diverge from agency precedent, the Board must supply a reasoned analysis indicating that prior policies and standards are being deliberately changed, not casually ignored.") (citation omitted).

[6] As the majority notes, we review the Board's factual findings for substantial evidence. *See Universal Camera Corp. v. NLRB*, 340 U.S. 474, 477, 71 S. Ct. 456, 459, 95 L. Ed. 465, __ (1951); *NLRB v. Thermon Heat Tracing Servs., Inc.*, 143 F.3d 181,

To qualify as "concerted" activity, conduct need not necessarily be communal. However, to be considered "concerted," Pemberton's conduct "must appear at the very least . . . engaged in with the object of initiating or inducing or preparing for group action or that it had some relation to group action in the interests of the employees." *NLRB v. Buddies Supermarkets, Inc.*, 481 F.2d 714, 718 (5th Cir. 1973). By contrast, it is well-settled that purely personal "griping" is not concerted activity and thus unprotected by the Act. *See NLRB v. City Disposal Sys., Inc.*, 465 U.S. 822, 832 n.10, 104 S. Ct. 1505, 1512 n.10, 79 L. Ed. 2d 839, __ (1984); *Scooba Mfg. Co. v. NLRB*, 694 F.2d 82, 84-85 (5th Cir. 1982) ("Purely personal disputes are not within the protection of the Act. The [Board] must show that some sort of collective worker action is contemplated.")

What the Board calls the "concerted precipitating event" of

---

185 (5th Cir. 1998). However, when (as here) the NLRB has rejected the findings of the ALJ, our review for substantial evidence involves heightened scrutiny. *See Centre Property Management v. NLRB*, 807 F.2d 1264, 1268 (5th Cir. 1987) ("Such scrutiny is more searching than it is when the Board and the ALJ are in agreement."); *U.S. Contractors, Inc. v. NLRB*, 697 F.2d 692, 695 (5th Cir. 1983); *Earle Industries, Inc. v. NLRB*, 75 F.3d 400, 404 (8th Cir. 1996) ("We examine the Board's findings more critically when, as here, the Board's conclusions are contrary to the ALJ's, because the ALJ's opinion is part of the record we must consider."); *Ewing v. NLRB*, 732 F.2d 1117, 1120 (2d Cir. 1984) ("When the Board overturns the determinations made by an ALJ . . . its own findings must be stronger than would be [otherwise] required."); *cf. Garcia v. Secretary of Labor*, 10 F.3d 276, 280 (5th Cir. 1993) ("Although this heightened scrutiny does not alter the substantial evidence standard of review, it does require us to apply it with a particularly keen eye.").

Pemberton's dismissal is his statement, to fellow employees, that:

> [Mobil] is trying to fire me, they have gotten a security guy, John Burton after me because I was trying to right a wrong. John Burton will dig something up on me. You know what I'll do, I'll sue the shit out of them.

> [Waszczak]'s the one who turned me in to John Burton. She knows about it. I wouldn't be surprised if he had this phone tapped so he can hear what I'm saying out here. Do you know where [Mobil] gets its investigators . . . from the military. John Burton called me at my home on Friday and Saturday night. People say to me, 'Bob, you are just out to get Thibodeaux.' I tell them they are wrong, I'm not out to get him. He is wrong, he is giving things to [Mobil], we don't have a union, we need to get in with the OCAW, we can't do anything because of the [union]. He's not going to be president much longer.

The majority agrees with the Board that these statements were "another attempt to enlist the support of other employees in opposition to the policies and alleged derelictions of the incumbent Union leadership, not merely a personal complaint." *Mobil*, 1997 WL 713342 at * 3.

This assertion is simply not supported by the record.[7] The

---

[7] Despite the majority's statements to the contrary, *see* Maj. Op. n. 1, all of the evidence considered by this opinion was part of the record in this case. The parties agreed that the record would include not only the stipulation of facts but also the "attached Exhibits" to which the stipulations refer. Pemberton's testimony before the arbitrator (a portion of which appears in the text below), where he himself described that the statements for which he was fired had nothing to do with a desire to spark group activity, *was* part of the record on which the ALJ ruled, and which the Board and this Court must consider. *See* Stipulation of Facts, ¶ 42 ("A copy of the arbitration transcript is attached hereto as Exhibit 15."); *see also* 29 U.S.C. § 160(f) (mandating that Courts of Appeals review Board action by examining the "record considered as a whole"). I do not dispute that we are bound by the stipulated facts. However, none of the stipulated facts, alone or in combination, establish that the statements for which Pemberton was

evidence suggests that Pemberton was merely verbalizing his ongoing personal dispute with Thibodeaux, not attempting to mobilize group support for any "concerted" effort. At the arbitration hearing, when asked to describe the aforementioned conversation, Pemberton replied:

> The conversation was about Glenn Thibodeaux, and it was about me stating that))I was being investigated, that I was pretty much in fear of my job and that the))I brought up the time, the overtime. I brought up about, oh, some other incidents that had happened further back in the past with Glenn too.

Neither Pemberton nor the majority identifies what "group action" the statements were intended to prompt, and it is impossible to conjecture such intent from the statements or the context in which they were made. There is thus no basis in the record for the majority's assertion that Pemberton's statement was intended "to serve as the catalyst for future group action." Rather, the record indicates that Pemberton was solely addressing his personal vendetta against Thibodeaux.

Considering only the evidence in the record, the facts in the instant case are akin to those in *Buddies Supermarkets*, 481 F.2d at 718-720. There, an employee was fired because of his complaints to fellow employees about his terms of compensation. We held that

---

fired were "engaged in with the object of initiating or inducing or preparing for group action." *Buddies Supermarkets*, 481 F.2d at 718. At best, the stipulations prove that, in the past, Pemberton may have been involved in some "concerted" activity. Pemberton's testimony, which does not contradict any of the stipulated facts, proves that the particular acts for which he was fired were not "concerted."

activity was not "concerted" because "it appears from the conversations themselves that no group action of any time is intended, contemplated, or even referred to." *Id.* at 718. The employee at issue there, like Pemberton, had not been designated by other employees as a group representative, and there was no evidence in the record that any other employees shared his concerns. Rejecting the Board's assertion that "since he was speaking on matters of common concern to all of the [employees], he was ipso facto engaged in concerted activity," we held the employee's activity to be mere personal griping, not concerted activity. *Id.* at 719.

Furthermore, the majority's distinction of *NLRB v. Datapoint Corp.*, 642 F.2d 123, 125-27 (5th Cir. Unit A 1981), is not persuasive. There, an employee was discharged for complaining to fellow employees that planned company layoffs were "illegal." We reversed the Board's determination that this activity was "concerted," citing the lack of evidence to indicate that the statements were intended to initiate group action even though other employees obviously shared the dismissed employee's concern (that they would be fired). *Id.* Here, as in *Datapoint*, neither the Board nor the majority has pointed to any evidence in the record showing that Pemberton intended to spark group activity.[8] If the

---

[8]    The majority seems to argue that our decision in *Datapoint* was based in some respects on the manner in which the employee made his statements: "loudly" and "using profanity."

employee in *Datapoint* was, as the majority claims, a "disgruntled loner," there is no evidence in the record by which to distinguish that employee from Pemberton.  The Board's argument that Pemberton somehow sought to enlist group support for an anti-Thibodeaux or anti-union effort is mere conjecture.[9]

The Board and the majority point to several other facts which they claim support the construction of Pemberton's activity as concerted.  None, however, sufficiently support that construction. First, the fact that Pemberton may have mentioned a "union" at the end of his speech is insufficient basis to hold his activity "concerted."  *See Scooba*, 694 F.2d at 84 ("[T]he Board urges that if any employee uses the word "union" . . . he or she is

---

However, the decision in *Datapoint* clearly rested on our finding that the employee's statements were not "concerted," not on any finding they were not "protected."  *See Datapoint*, 642 F.2d at 128 ("The Board's notion of concerted activity runs contrary to the law of this circuit.").

[9]   The majority's reliance on *Blue Circle Cement Co. v. NLRB*, 41 F.3d 203 (5th Cir. 1994) is inapposite.  In *Blue Circle*, we held that an employee's use of the company copy machine to duplicate articles protesting the company's proposed burning of hazardous waste was concerted activity.  *Id.*  We supported that holding with several facts specific to that case: first, that the union "had appointed [the employee] to lead the fight against [the company's] plan to use hazardous waste", *id.* at 207; second, that the actions were the logical outgrowth of the union's plan to oppose the company's proposal, *id.* at 208; and, third, that the Board had merely affirmed the findings of the ALJ on all fronts, *id.*  None of these facts are present in the case at bar.  There is no evidence that Pemberton was appointed a group representative for the purpose of fighting Thibodeaux's alleged corruption, no evidence that any other employee or group thereof was engaged in this activity, and the Board reversed the findings of the ALJ.

automatically engaged in protected concerted activity.  We do not agree. . . . The [Board] must show that some sort of collective worker action is contemplated..").  Second, the fact that possible corruption of a union leader may affect all employees is insufficient to establish that speaking about it is "concerted"))the speaker must intend that group activity result from his speech.  *See Datapoint,* 642 F.2d at 125-27; *Pelton Casteel, Inc. v. NLRB*, 627 F.2d 23, 28 (7th Cir. 1980) ("[P]ublic venting of a personal grievance, even a grievance shared by others, is not a concerted activity.").

The arbitral award in this case was not "clearly repugnant" to the policies of the Act protecting "concerted" activities.  In fact, there is a strong argument that Pemberton's statements were not "concerted" at all.  The Board, therefore, failed to defer despite the reasonableness of the arbitrator and ALJ's decisions.

The Board and the majority also assert that Pemberton's activities were of the type of concerted activities considered "protected."  Even if they are "concerted," statements can lose § 7 protection based on (1) their subject matter, *see International Bus. Machs. Corp.*, 265 N.L.R.B. 638, 638-39 (1982) (upholding dismissal based on employee revelation of wage data to other employees), or (2) the manner in which they are made, *see United Parcel Service, Inc.*, 311 N.L.R.B. 974, 975 (1993) (upholding dismissal based on employee's failure to stop inquiring into a

company investigation, and stating that "[T]he manner in which an employee exercises a statutory right can be so extreme as to lose the Act's protections."). *See also City Disposal Sys.*, 465 U.S. at 836, 104 S. Ct. at 1514, 79 L. Ed. 2d at __ (holding that concerted activities can be conducted "in such an abusive manner that [the employee] loses the protection of § 7").

Pemberton's statements contain elements of both improper subject matter, in that they arguably disclosed information about a confidential investigation, and inappropriate manner, in that the statements were rude and insubordinate. The arbitrator and the ALJ upheld the dismissal both because Pemberton's disclosure of Mobil's internal investigation was unreasonable and because, by disclosing the investigation to his co-workers, Pemberton "breached his freely given confidentiality promise."

The Board, conducting a balancing test, held that the Pemberton's interest in conducting "concerted activity" outweighed Mobil's "exceedingly minimal" interests in keeping the information confidential. The Board and majority agree that Mobil's interest was minimal because, in their words, "nothing in Pemberton's July 17th remarks could have alerted Thibodeaux or anyone else to the fact that Thibodeaux was under investigation."[10] Essentially, they

---

[10] The Board and majority also argue that Mobil's confidentiality interest is "exceedingly minimal" because Thibodeaux was already alerted to the fact that he was being investigated. Therefore, the Board asserted, the company no longer had any interest in keeping the investigation secret. This argument ignores the fact that the company certainly, among of

opine that because Pemberton's statements did not reveal the existence of an investigation, the statements did not disclose confidential information or breach Pemberton's promise not to disclose.[11]

The arbitrator found that Pemberton had revealed the existence of the investigation after hearing the testimony of Pemberton, several co-workers, and Waszczak. Pemberton, while admitting the conversation involved both an "investigation" and "Thibodeaux," asserted that he never discussed the investigation of Thibodeaux. Waszczak (who allegedly overheard the conversation) testified that Pemberton did discuss the company's investigation of Thibodeaux. While Pemberton's stipulated statement was admittedly vague, the arbitrator held that, in context, it revealed the existence of the investigation and thus constituted insubordination of Burton's direct order not to reveal such information.

Whether or not Pemberton's conversation with his co-workers

---

plethora of potential reasons, had an interest in keeping the investigation secret to promote disclosure on the part of other employees and prevent the destruction of evidence. Neither Board nor majority has provided any analysis behind which to overturn the ALJ's finding that Mobil had a "substantial and legitimate business interest in keeping such internal investigations confidential."

[11] There is a clear inconsistency in the majority's analysis of Pemberton's statements. On one hand, the majority argues that the statements are "concerted" because they were intended to incite group action to protest Thibodeaux's improper activity. One the other hand, the majority argues, the statements were "protected" because no one could understand the statements to refer to Thibodeaux's alleged corruption. Both these statements cannot be true, and both must be for the majority's analysis to be correct.

disclosed the existence of the security agreement, a subject of conflicting testimony, was a factual matter for the trial examiner to decide. It is difficult to see how the Board, two steps removed from hearing live testimony on the subject, could have come to a contrary conclusion with enough certainty to declare the arbitrator's finding "palpably wrong." When there is conflicting testimony on an issue, Board deference to the findings of arbitrators and ALJs should be at its apex, as credibility determinations are involved. *See Blue Circle Cement Co.*, 41 F.3d at 206; *ASARCO, Inc. v. NLRB*, 86 F.3d 1401, 1406 (5th Cir. 1996) ("We are bound by the credibility choices of the ALJ unless one of the following factors exists (1) the credibility choice is unreasonable, (2) the choice contradicts other findings, (3) the choice is based upon inadequate reasons or no reason, or (4) the ALJ failed to justify his choice."). There is not substantial evidence in the record to support the Board's decision to overrule the trial examiner.

Deprived of its assertion that Pemberton did not actually disclose the confidential information in his statements, the majority's analysis falls of its own weight. First, it is well-settled that employers may dismiss employees for disclosing confidential information to the detriment of the company. *See Texas Instruments Inc*., 637 F.2d 822, 826-28 (1st Cir. 1981) (upholding dismissal of employee for disclosing confidential

employer information); *NLRB v. Knuth Bros., Inc.*, 537 F.2d 950, 956 (7th Cir. 1975) ("In revealing the information, Popovitch acted in reckless disregard of his employer's business interests.); *International Bus. Machs. Corp.*, 265 N.L.R.B. at 638 (affirming discharge because of employee disclosure of confidential wage information); *Altoona Hospital*, 270 N.L.R.B. 1179, 1180 (1984) ("An employee's violation of an employer's rule against the disclosure of confidential information may also be the subject of lawful discipline even when the disclosure is made for reasons arguably protected by the Act.")[12]  Second, the law clearly allows for dismissal based on employee insubordination.  "The legal principle

---

[12]     The majority attempts to distinguish *Altoona* as well as several cases cited by Mobil and the ALJ by arguing that the employee in those cases had "weak" claims of protected activity balanced against employers' "clearly legitimate" interests in confidentiality.  As described above, however, Pemberton's claim of "concerted" activity was extremely weak, far weaker than the employees in *Craig Hospital*, 308 N.L.R.B. 158, 165 (1992), who sought to use the confidential information to assist aggrieved colleagues, *Altoona*, 270 N.L.R.B. at 1180, which involved an employee use of confidential information to support a statutorily protected grievance, and *Bell Federal Savings and Loan Ass'n of Bellevue*, 214 N.L.R.B. 75, 76-8 (1974) which involved an employee's using confidential information to alert the union to possible improprieties on the part of the company president. The majority supports its interpretation by citing *110 Greenwich Street Corp.*, 319 N.L.R.B. 331, 334 (1993).   However, *Greenwich* involved employees displaying signs on their automobiles asking their employer to honor its commitments. *See id.* Not only was that an obvious case of concerted activity, but it did not involve (as in this case) any employee disclosure of confidential information.  In fact, neither the Board nor the majority cites any authority describing a situation in which an employer's interest in confidentiality of information was outweighed by employee interests in disclosure.

that insubordination, disobedience or disloyalty is adequate cause for discharge is plain enough." *NLRB v. Local Union No. 1229, International Brotherhood of Electrical Workers*, 344 .S. 464, 475, 74 S. Ct. 172, 178, 98 L. Ed. 195 (1953); *see also NLRB v. Finesilver Manu. Co.*, 400 F.2d 644, 649 (5ᵗʰ Cir. 1968) ("An employee cannot ordinarily be selective in the manner of obeying a supervisor's instructions. If instructions are flagrantly disobeyed, the employee is properly discharged."); *cf. NLRB v. Mueller Brass Co.*, 509 F.2d 704, 713 (5ᵗʰ Cir. 1975) (reversing the Board because "[a]ny employer has the right to demand that its employees be honest and truthful in every facet of their employment").

Therefore, there is a substantial question as to whether Pemberton's statements are the type of conduct "protected" by § 7. The arbitrator's and ALJ's decisions holding that Pemberton's insubordination was sufficient grounds for his dismissal were thus not "palpably wrong" and should have been affirmed by the Board.

Whether Pemberton's conduct was both "concerted" and "protected" is, at the very least, debatable among jurists of reason. Thus, I cannot agree that the arbitral award was "not susceptible to an interpretation consistent with the act." Recognizing our duty to enforce Board adherence to its own standards, *see South Cent. Bell Tele.*, 688 F.2d at 350, and the NLRA policy favoring arbitration of labor disputes, *see Richmond*

97-60789.CV0                              61

*Tank Car*, 721 F.2d at 501, I believe that the Board abused its discretion in failing to defer to the arbitrator's and ALJ's decisions and that the Board's order should not be enforced. Accordingly, I dissent.